## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

```
U.S. FILED
INDIANAPOLIS COURT
        DIVISION
08 JUN 13 PM 3: 11
SOUTHERN DISTRICT
    OF INDIANA
LAURA A. BRIGGS
      CLERK
```

```
-------------------------------------------------------x
KATHLEEN SEARS, On Behalf of          :
Herself and All Others Similarly Situated,   :
                                      :
            Plaintiff,                :
                                      :
                                      :
   vs.                                :
                                      :
WELLPOINT, INC., PENSION              :
COMMITTEE OF ANTHEM INSURANCE         :
COMPANIES, INC., ANGELA F. BRALY,     :
WAYNE DEVEYDT, LARRY C.               :
GLASSCOCK, and RANDAL C. BROWN,       :
                                      :
            Defendants.               :
-------------------------------------------------------x
```

Case No.

# 1 : 08 -cv- 0800 -DFH -TMS
JURY TRIAL DEMANDED

## COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE
## RETIREMENT INCOME SECURITY ACT

Plaintiff Kathleen Sears ("Plaintiff") is a participant in the WellPoint ("WellPoint" or the "Company") 401(k) Retirement Savings Plan (also known as the WellPoint Retirement Savings Plan) (the "Plan")[1]and brings this action on behalf of herself and a class of all others similarly situated participants (the "Participants"), alleging as follows:

### INTRODUCTION

1.      This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against the Plan fiduciaries, including WellPoint.

2.      Plaintiff is a participant in the Plan whose retirement investment portfolio included WellPoint stock during the Class Period (as defined below).

3.    Plaintiff's claims arise from the failure of defendants, who are Plan fiduciaries, to act solely in the interest of the Participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets during the Class Period, as required by ERISA.

4.    Plaintiff alleges that defendants, as fiduciaries of the Plan, breached their duties to Plaintiff and to the other Participants and beneficiaries of the Plan in violation of ERISA, particularly with regard to the Plan's holdings of WellPoint stock, by failing to disclose material facts concerning WellPoint's medical costs and medical enrollment levels and by issuing false and misleading earnings guidance.

5.    Defendants misrepresented and failed to disclose that the Company was experiencing significant increases in its medical costs and adverse reserve developments which would require increases to WellPoint's medical cost reserve, thereby increasing its medical costs. In addition, WellPoint's membership growth was weighted more towards the less profitable self-funded products and enrollment in fully insured products was down. This mix of enrollment, weighted toward WellPoint's less profitable products, was negatively affecting WellPoint's profitability during the Class Period and would continue to negatively impact profits throughout 2008. Instead of disclosing the problems with WellPoint's business, defendants concealed it and made positive statements about the Company's business and provided false earnings guidance.

6.    On March 10, 2008 defendants disclosed the truth to the market and the price of WellPoint's common stock dropped 28.3% to close at $47.26, on volume of more than 54 million shares traded, many times the average daily trading volume for WellPoint common stock.

7.    Defendants' breaches of fiduciary duty unjustly enriched certain of the Plan's

---

[1]    The Plan was formerly known as the Anthem 401(k) Long Term Savings Investment Plan and changed its name effective December 31, 2005.

fiduciaries to the detriment of the Plan and its Participants. During the Class Period, certain of the Plan's fiduciaries sold their own WellPoint common stock for proceeds of more than $14.6 million at the same time that those defendants were causing the Plan to use Plan assets to acquire that stock. Upon information and belief, some of the Plan's assets were used to purchase and acquire this stock.

8.      Throughout the Class Period, WellPoint's Plan communications, annual reports and proxy materials and other SEC filings were false and misleading.

9.      At the same time that these fiduciaries were making these false statements, they were causing the Plan and its Participants to acquire and hold WellPoint stock at inflated prices.

10.     When the market learned about the defendants' false statements, the Company's stock price plummeted, taking with it the retirement savings in the Plan.

11.     During the Class Period, defendants knew or should have known that WellPoint stock was an imprudent investment alternative for the Plan. Defendants are liable under ERISA to restore the lost profits and the losses of vested benefits sustained by the Plan as a result of defendants' breaching of their fiduciary obligations.

12.     Plaintiff seeks alternative types of relief under ERISA.

13.     First, Plaintiff and the Plan seek their lost profits as a result of defendants' breaches. In particular, Plaintiff and the Plan seek the profit they lost by investing in WellPoint stock instead of in other funds within the Plan that were available at the time and which have outperformed the returns on WellPoint stock.

14.     Second, Plaintiff and the Plan seek to recover the losses that they incurred by investing their retirement funds in WellPoint stock at a time when the stock price was artificially inflated.

3

15. Third, Plaintiff and the Plan seek to recover the losses caused to the Plan and its Participants when the price of WellPoint's stock declined significantly as the market began to learn the truth about WellPoint's business.

16. Fourth, Plaintiff seeks a Constructive Trust -- both individually and on behalf of the Plan -- over all amounts by which the Plan fiduciaries benefited as a result of their breaches. In particular, Plaintiff seeks to impose a Constructive Trust on the amounts received by defendants for selling their WellPoint stock, including amounts that defendants received when they sold WellPoint common stock at the same time that those defendants were causing the Plan to use Plan assets to acquire that stock.

## JURISDICTION AND VENUE

17. **Subject Matter Jurisdiction**: This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a). This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1). In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

18. **Personal Jurisdiction**: ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the defendants are residents of the United States and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they all would be subject to the jurisdiction of a court of general jurisdiction in the State of Indiana. WellPoint maintains its executive offices in this District at 120 Monument Circle, Indianapolis, Indiana.

19. **Venue**: Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C.

4

§ 1132(e)(2), because the Plan was administered in this district and some or all of the fiduciary breaches for which relief is sought occurred in this district.

## THE PARTIES

20.    Plaintiff is and was a WellPoint employee at all relevant times, is a participant in the Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held WellPoint stock in her retirement investment portfolio at all relevant times.

21.    Defendant WellPoint describes itself as the largest health benefits company in terms of commercial membership in the United States. It was formerly known as Anthem, Inc.

22.    On November 30, 2004, Anthem, Inc. and WellPoint Health Networks Inc. ("WHN") completed a merger in which WHN merged with and into Anthem Holding Corp. with Anthem Holding Corp. as the surviving entity in the merger. Anthem then amended its articles of incorporation to change its name to WellPoint, Inc. Plaintiff uses "WellPoint" or the "Company" in this Complaint to refer to WellPoint and its predecessor entities.

23.    The Company is an independent licensee of the Blue Cross and Blue Shield Association and serves its members as the Blue Cross licensee in California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia and Wisconsin.

24.    WellPoint's members fall principally into two categories: (a) "self-funded" policies that are managed by WellPoint on behalf of the members ("Self-Funded members"; "Self-Funded products"); and (b) fully insured products ("Fully-Insured members"; "Fully-Insured products"). Under self-funded products, WellPoint charges a fee for services, and the employer or plan sponsor reimburses WellPoint for all or most of the healthcare costs. For fully insured products, WellPoint charges a premium and assumes all or a portion of the healthcare

risk. Self-funded products are less profitable for WellPoint than fully insured products.

25.     During the Class Period, WellPoint was registered with the SEC and filed annual, quarterly and other reports with the SEC.

26.     Defendant WellPoint is a fiduciary of the Plan because it is named as the Plan Administrator.

27.     The Plan documents and the Forms 5500 filed by the Plan with the Department of Labor ("DOL") identify WellPoint (or its predecessor Anthem) as the Plan Administrator.

28.     WellPoint had effective control over the Plan-related activities of its directors, officers and employees and at all times acted through its Board of Directors as well as its officer and employees, appointed to perform Plan-related fiduciary functions in the course and scope of their employment.

29.     Through its Board of Directors or otherwise, WellPoint had the authority and discretion to hire and terminate those officers and employees and had the authority and discretion to appoint, monitor, and remove officers and employees in their individual fiduciary roles with respect to the Plan.   Accordingly, the actions of the Board of Directors, the Company's committees and other employee fiduciaries are imputed to WellPoint under the doctrine of *respondeat superior*.

30.     WellPoint is a named or *de facto* fiduciary of the Plan within the meaning of ERISA.

31.     WellPoint exercises discretionary authority with respect to managing and administering the Plan and its assets, including the selection of the Plan's investments.

32.     Upon information and belief, defendant Pension Committee of Anthem Insurance Companies, Inc. (also known as the Pension Committee of WellPoint, Inc.) (the "Committee")

6

consists of various officers and employees who manage the operation and administration of the Plan. The Committee is a named fiduciary of the Plan and exercised discretionary authority and control with respect to managing and administering the Plan and its assets.

33.    The Individual Defendants identified below served, at times relevant to the claims set forth herein, as senior officers and/or directors of WellPoint and as fiduciaries of the Plan as follows (the "Individual Defendants"):

(a)    Defendant Angela F. Braly ("Braly") is, and has been since June 1, 2007, WellPoint's Chief Executive Officer and President and a member of the Company's Board of Directors. Prior to June 1, 2007, Braly served as WellPoint's Executive Vice President, General Counsel and Chief Public Affairs Officer. As alleged below, Braly was a principal spokesperson on the Q4 2007 Earnings Conference Call and the March 10, 2008 Conference Call and in WellPoint's press releases and signed the Company's Form 10-K filed with the SEC on February 21, 2008 which was incorporated by reference into Plan documents and was posted by the Company on the same web site which contained other Plan documents, including the Plan's annual report.

(b)    Defendant Wayne DeVeydt ("DeVeydt") is, and has been since before the beginning of the Class Period, WellPoint's Executive Vice President and Chief Financial Officer. DeVeydt has also had responsibility for investor relations and became chief of staff to the Office of the CEO in 2006. As alleged below, DeVeydt was a principal spokesperson on the Q4 2007 Earnings Conference Call and the March 10, 2008 Conference Call and signed the Company's Form 10-K filed with the SEC on February 21, 2008 which was incorporated by reference into Plan documents and was posted by the Company on the same web site which contained other Plan documents, including the Plan's annual report..

(c)     Defendant Larry C. Glasscock ("Glasscock") is, and has been since November 2005, Chairman of the Company's Board of Directors.   Glasscock signed the Company's Form 10-K filed with the SEC on February 21, 2008 which was incorporated by reference into Plan documents and was posted by the Company on the same web site which contained other Plan documents, including the Plan's annual report.  Defendant Glasscock sold $6.6 million worth of WellPoint stock during the Class Period at artificially inflated prices at the same time that he and other fiduciaries were causing the Plan and its Participants to acquire and hold WellPoint stock with Plan assets;

(d)     Defendant Randal C. Brown ("Brown") was at all relevant times the Company's Executive Vice President and Chief Human Resources Officer and was the Chairman of the Committee.  Defendant Brown signed the Plan's annual report on Form 11-K on behalf of the Plan and the Committee.  At the same time that he and other fiduciaries were causing the Plan and its Participants to acquire and hold WellPoint stock with Plan assets, Defendant Brown sold more his own shares of WellPoint stock for proceeds of more than $8.4 million at artificially inflated prices.

34.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, reserve policies, operational trends, finances, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof and via reports and other information provided to them in connection therewith.

35.     As fiduciaries of the Plan each defendant had a duty to disseminate promptly accurate, complete and truthful information with respect to the Company's financial condition and performance, growth, operations, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the Plan and its Participants could accurately assess the risk of investing in WellPoint stock through the Plan.

36.     Each defendant was a named or *de facto* fiduciary with respect to the Plan.  All defendants exercised discretionary authority or control regarding management of the Plan, management of the Plan's assets, and/or administration of the Plan.

37.     During the Class Period, each defendant acted as a fiduciary of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

### THE PLAN

38.     The Plan is an "employee pension benefit plan," as defined by §§ 3(3) and 3(2)(A) of ERISA, 29 U.S.C. § 1002(3) and 1002(2)(A).   The Plan is a legal entity which can sue or be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(l).  However, in a breach of fiduciary duty action such as this, the Plan is neither a plaintiff nor a defendant.  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan.  Stated differently, in this action, Plaintiff seeks relief on behalf of the Plan.

39.     Alternatively, Plaintiff seeks relief on behalf of herself and the other Participants in the Plan in accordance with ERISA and the recent U.S. Supreme Court decision in *LaRue v. DeWolff, Boberg, & Assocs., Inc.,* 128 S. Ct. 1020 (2008).

40.     According to the Plan's latest annual report on Form 11-K for the year ended

December 31, 2006 (filed on June 13, 2007), the Plan is a defined contribution plan in which all employees of the Company and certain of its subsidiaries ("Participating Employers") are eligible to participate.

41.    Participants may make voluntary pretax contributions of 1% to 60% of eligible compensation annually, as defined in the Plan document, subject to limitations imposed by applicable IRS regulations. After the Participant has completed one year of service, the Company will match up to 100% of the first 6% of the Participant's pretax contribution.

42.    Participant investment options consist of certain investment funds, including the WellPoint Stock Fund, plus a Self-Managed Account ("SMA") option. Each of the investment funds, including the WellPoint Stock Fund, is divided into units of participation, which are calculated daily by the recordkeeper.  The daily value of each unit is determined by dividing the total fair market value of all assets in each fund by the total number of units in that fund. Investment income, including certain administrative fees and net appreciation (depreciation) of the fair value of investments, are allocated to each Participant's account based on the change in unit value for each investment fund in which the Participant has an account balance.

43.    The SMA is a brokerage option offered through the Plan that allows investments in approximately 2,000 different mutual funds. As a brokerage account, this option is not unitized or collectively priced.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

44.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the following class of persons similarly situated (the "Class"):

> All persons who are Participants in or beneficiaries of the Plan at any time from 2007 through the present (the "Class Period") and

whose accounts held Company stock or securities.

45.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, there were (at a minimum) thousands of members of the Class who participated in, or were beneficiaries of the Plan during the Class Period. The Plan's most-recent annual report on Form 5500 represented that the Plan had more than 21,000 Participants.

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether defendants each owed a fiduciary duty to Plaintiff and members of the Class;

(b)     Whether defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's Participants and beneficiaries; and

(c)     Whether defendants violated ERISA.

47.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained lost profits and/or a loss of vested benefits arising out of defendants' wrongful conduct as complained of herein.

48.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, ERISA, and complex civil and commercial litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

49.     Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members or the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical manner, be dispositive of the interests of the other members of the Class parties to the actions, or substantially impair or impede their ability to protect their interests.

50.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecuting separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for defendants; (ii) defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

51.     Excluded from the Class are defendants, the officers and directors of the Company and its subsidiaries and affiliates, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

52.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING
## STATEMENTS DURING THE CLASS PERIOD

53.     During the Class Period, defendants violated their fiduciary duties by repeatedly issuing false and misleading statements which failed to disclose the problems that WellPoint was experiencing.

54.     On January 23, 2008, for example, the Company issued a press release announcing its Q4 and full year 2007 results.  Defendant DeVeydt is quoted in the press release stating that "[w]e remain confident in our earnings per share target of $6.41 for 2008, which represents annual growth of 15.3 percent."  In discussing membership, the press release stated that approximately 144,000 members from Connecticut's Medicaid managed care programs had been converted in Q4 2007 from fully insured to self-funded contractual arrangements.  Defendants stated that these 144,000 members were currently being serviced under a self-funded arrangement set to expire on February 29, 2008.  Under the heading "OUTLOOK," defendants stated, among other things, that WellPoint continues to expect net income of $6.41 per share, expects medical enrollment to reach approximately 35.6 million members, representing growth for the year of approximately 800,000 members, and expects the benefit expense ratio to be approximately 81.6 percent.

55.     Also on January 23, 2008, WellPoint held its Q4 2007 Earnings Conference Call during which defendants Braly and DeVeydt were the principal spokespersons for WellPoint.  Numerous analysts joined the conference call, including analysts from Goldman Sachs, JP Morgan, Citigroup and Oppenheimer & Co.

56.     On the conference call, defendant Braly stated that WellPoint was "maintaining our $6.41 earnings per share" guidance for 2008 and that "reduced membership" experienced in 2007 had virtually no impact on WellPoint's earnings per share.  DeVeydt reiterated the statements

made by Braly on the conference call. While acknowledging that WellPoint had experienced a rise in medical costs in Q4 2007, DeVeydt was quick to assure the market that:

- "[t]he higher than expected 4Q '07 benefit expense ratio resulted from items that generally should not impact 2008";

- "our 2008 benefit expense ratio guidance remains at 81.6% for the year, given the strong full-year 2007 operating results";

- "we continue to expect our 2008 medical cost trend to also be less than 8%";

- "medical enrollment is now expected to approximate 35.6 million members with fully insured membership now expected to be 17.1 million and self-funded membership expected to be 18.5 million"; and

- "operating revenue is now expected to total approximately $62.6 billion."

57.     On the Q4 2007 Earnings Conference Call, defendants provided detailed information concerning WellPoint's 2007 results and the impact on WellPoint's 2008 results, both on a year-end basis and a quarterly basis. Defendants also answered very specific questions directed to them by the attending analysts and made a series of additional false and misleading statements in those answers.

58.     On the conference call, several Wall Street analysts asked questions of management. The analyst from Morgan Stanley raised the issue of the relationship between WellPoint's medical costs, product pricing and profit margins, asking what the impact on 2008 profitability would be where WellPoint had actually lowered its pricing of products entering 2008 and following the higher medical costs in 2007 that WellPoint had experienced which required it to

increase its reserves for medical costs at year-end 2007. Defendant DeVeydt responded by saying that he was "not worried about '08, but your point is dead on for '07." DeVeydt added that "I still feel very confident in our pricing and our renewals."

59. When questioned by the analyst from UBS about the adequacy of the reserves for medical costs, defendant DeVeydt responded by saying, in pertinent part, that "we've met with the actuaries . . . and . . . we want to ensure that when we go into '08, that we go in with great confidence, that we're not going to fall short."

60. The analyst from Citigroup asked at what point in 2007 WellPoint knew that fourth quarter 2006 medical costs had increased beyond the levels that WellPoint had reserved for. DeVeydt responded that "by basically mid February [2007], we had pretty good visibility that we were starting to develop less favorably."

61. The analyst from Deutsche Bank asked whether WellPoint had factored the slowing economy and its impact on medical cost trends into its 2008 guidance. DeVeydt responded, saying that "we have backed into our guidance an assumption for a slowdown and specifically, we were very specific about it relative to the National Account business that we had expected. Now the good news is I think our assumptions were conservative and we are actually seeing slightly better than expected results there, which is good."

62. Braly ended the Q4 Earnings Conference Call stating that "we had a productive year in 2007 and we're off to a good start for 2008."

63. On February 21, 2008, the Individual Defendants signed and filed or caused to be filed with the SEC WellPoint's 2007 Form 10-K which was incorporated by reference into the Plan documents.

64. In the MD&A section, at pages 40-41, defendants highlighted the importance of

"profitable enrollment growth" in achieving 15% growth in earnings per share, and stated their belief that WellPoint's geographic diversity reduced the impact of economic pressures on WellPoint's earnings and provided WellPoint with "increased opportunities for growth."

65.    Defendants also stated, at page 63, that they continually monitor and adjust claims liability and benefit expense based on subsequent paid claims activity and that because WellPoint's business is "primarily short tailed," page 66, incurred claims are quick to show up and, therefore, defendants can quickly assess and adjust the adequacy of the Company's reserves for medical costs.

66.    At no place in the 2007 Form 10-K did defendants correct any of their false and misleading statements they had made, as alleged above, or disclose that WellPoint had experienced in 2008, to date, a significant rise in medical costs, an unprofitable shift in new enrollment to Self-Funded members, and had priced its 2008 products at less profitable levels, and that as a result of these adverse material facts, the guidance that defendants had given the market on January 23, 2008 was no longer viable.

67.    The statements referenced above were materially false and misleading because when Defendants made these statements:

(a)    WellPoint was experiencing a significant increase in medical costs commencing January 1, 2008 to the extent that defendants had no basis in fact which supported their earnings guidance or their benefit expense ratio guidance.  In fact, defendants knew that earnings for Q1 2008 would likely be in the range of $1.16 to $1.26 per share, rather than the $1.44 per share which defendants told the market on January 23, 2008.  Defendants knew of the significant rise in medical costs on a real-time basis in 2008, in part, as Q4 2007 medical claims came in for processing and payment.  For example, commencing January 1, 2008, defendants

experienced a significant rise in oncology and other medical claims. Defendants also admitted on the March 10, 2008 Conference Call, that they knew, at the outset of 2008, that WellPoint's claims cycle time (the time between date of service and date of claim payment) had slowed considerably. Thus, defendants knew on January 23, 2008, that there were a significant number of claims from Q4 2007, and earlier, that had been incurred but had not yet been paid. Defendants did not factor these claims into their calculation of medical costs for 2008. Thus, defendants, despite their statements to the contrary on January 23, 2008, had not properly factored in the actual medical costs and trends in medical costs that WellPoint had been and was experiencing, including costs in WellPoint's senior medical advantage and commercial businesses. Indeed, as Braly and DeVeydt admitted in the March 10, 2008 Conference Call, there were existing adverse trends that they did not factor into their January 23, 2008 guidance;

(b)    WellPoint's reserves for medical costs were understated, in part, because, the claims incurred in 2007 were significantly higher than the reserves established at December 31, 2007, for those claims and WellPoint would be required at the beginning of 2008 to add $175 million to the reserve, $125 million of which would negatively impact WellPoint's profitability. Defendants knew that WellPoint's medical cost reserves were understated at January 23, 2008, as admitted by defendants on the March 10, 2008 Conference Call, in part because defendants knew, as alleged in subparagraph (a) above, that there were incurred medical costs which had not been paid and defendants did not factor those costs into their reserve calculations;

(c)    WellPoint's enrollment growth was heavily weighted toward self-funded products and members which were substantially less profitable for WellPoint. At January 1, 2008, defendants knew that the Connecticut membership would be operating under self-funded programs through February 29, 2008, at which time WellPoint would endeavor to renegotiate a contract on

17

reasonable terms. As defendants later admitted on the March 10, 2008 Conference Call, "half of the reduction in membership guidance relates to the Connecticut medicaid ASO contract." Thus, defendants not only knew that these Connecticut members would revert to less profitable "self-funded" status but that there was no assurance they would not lose these 144,000 members after February 29, 2008, thereby negatively affecting WellPoint's membership levels. Defendants also knew, on a real time basis, that the large majority of new enrollees coming on board in 2008, at the time they became enrolled, were in Self-Funded programs. Defendants further knew that WellPoint had experienced a 5.9% rise in Self-Funded members throughout 2007 and that there was no basis in fact for this trend to change in 2008, particularly in light of existing economic factors;

(d)    WellPoint was not achieving significant new enrollment of Fully-Insured members in 2008 and defendants knew this adverse material fact on a real time basis. Defendants also knew that growth in Medicare Advantage was greatly slowed and that WellPoint was suffering declines in enrollment in Small Group and Individual membership. Defendants further knew that WellPoint had experienced a decline in Fully-Insured members throughout 2007 and that there was no basis in fact for this trend to change in 2008, particularly in light of existing economic factors. In fact, the failure to achieve any significant growth in Fully-Insured members in 2008, to date, confirmed the 2007 trend in membership type. This failure exacerbated the financial impact of the growth in less profitable Self-Funded members and had an exponential adverse impact on WellPoint's earnings throughout 2008; and

(e)    WellPoint was being adversely impacted by economic factors which were not neutralized by WellPoint's geographic diversity and to an extent greater than defendants had factored into their 2008 guidance. During the Class Period, for example, defendants knew that the Medi-Cal premium would be reduced as of July 1, 2008, and that because Medi-Cal was

WellPoint's largest State Sponsored market, with approximately 1.2 million members, the adverse impact on WellPoint's profitability would be significant.

68.     As WellPoint's CEO and CFO, defendants Braly (CEO) and DeVeydt (CFO) also signed Sarbanes-Oxley Act of 2002 § 302 certifications falsely stating that the Company's Form 10-K did not contain any material misstatements or omit material information and that the reports fairly presented in all material respects the Company's financial condition and results of operations. These statements were untrue at the time they were made as alleged herein.

69.     Defendants Baly and DeVeydt should have known these certifications were materially false and misleading because WellPoint's financial statements did not fairly present the Company's financial condition.

70.     During the Class Period, defendant Glasscock sold his own WellPoint shares for proceeds of more than $6.6 million and defendant Brown sold his own WellPoint stock for proceeds of more than $8 million at the same time that those defendants were causing the Plan to use Plan assets to acquire WellPoint stock.

## THE TRUTH IS REVEALED

71.     In a surprising and sudden reversal, on March 10, 2008, after the close of the market, defendants issued a press release entitled "WellPoint Revises 2008 Earnings Per Share Guidance", admitting that "[f]or the first quarter of 2008, we are now expecting net income of $ 1.16 to $1.26 per share assuming net realized investment gain of $0.06 per share as compared to our previous guidance of $1.44 per share" and that "it now expects full year 2008 net income to be in the range $5.76 to $6.01, assuming net realized investment gains of approximately $0.06 per share."

72.     Thus, WellPoint dropped its growth guidance from 15.3% to a range of 4% to 8%,

and then only if it achieved investment gains of $0.06 per share. Defendants called a hastily scheduled conference call with analysts for 5:30 p.m. on March 10, 2008.

73.    In the press release, defendants attributed the sharp decline in WellPoint's financial and business position to a rise in medical costs, insufficient medical cost reserves, lower enrollment of Fully-Insured members and higher enrollment of Self-Insured members, caused, in part, by economic conditions.

74.    The market reacted very strongly to defendants' admissions, coming only six weeks after the Q4 2007 Earnings Conference Call.

75.    The price of WellPoint common stock dropped $18.66, on volume in excess of 54 million shares, to close at $47.26 per share on March 11, 2008, a decline of 28.3%.

76.    A Goldman Sachs analyst stated that "WellPoint's problems reflect company-specific underwriting error, but also reflect industry-wide pricing pressures that are now combined with upward pressure on underlying medical cost trends."

## DAMAGES TO THE PLAN AND ITS PARTICIPANTS

77.    As a result of defendants' breaches of fiduciary duty, the Plan and its Participants have been damaged.

78.    Because of defendants' breaches, the Plan and its Participants acquired WellPoint stock at artificially inflated prices when it was imprudent to do so.

79.    Because of defendants' breaches, the Plan and its Participants invested in WellPoint stock and continued to hold it in the Plan instead of investing in other, alternative investments which were available through the Plan.

80.    During the Class Period, WellPoint's stock was the second largest investment held by the Plan.

81.     Had defendants invested the Plan's assets in alternative investments, Plaintiff and the Plan would have profited instead of incurring losses in the WellPoint stock.

82.     The Plan and its Participants have lost profits because of defendants' fiduciary breaches.

83.     Plaintiff is asserting claims for "lost profits" under ERISA, including any profit that would have accrued to the Plan and its Participants if there had been no breach of fiduciary duty by defendants.

84.     Plaintiff's claims for lost profits include profits foregone by the Plan and its Participants because the defendant fiduciaries allowed the Plan to invest in WellPoint stock when it was imprudent to do so.

85.     When the market learned about defendants' violations of fiduciary duty, the price of WellPoint stock dropped significantly, taking with it the value of the vested retirement benefits in the Plan.

86.     Plaintiff and the Plan also have been damaged by investing Plan assets in WellPoint stock because after the market learned the truth about WellPoint, the value of WellPoint's stock and the retirement funds in the Plan declined significantly which deprived Participants of their vested retirement benefits.

87.     As a result, Plaintiff incurred a loss in the Plan which can be redressed through this lawsuit.

88.     During the Class Period, WellPoint's stock traded at prices above $80 per share.

89.     Following the disclosures in March 10, 2008, WellPoint's stock price dropped and now trades at approximately $48 per share.

## WELLPOINT STOCK WAS NOT A PRUDENT PLAN INVESTMENT

90.    Defendants did not effectively inform the Plan or its Participants of the past, immediate, and future dangers of investing in Company stock.

91.    In addition, defendants, as fiduciaries responsible for monitoring the investment of Plan assets, failed to adequately review the performance of the Committee to ensure that it and its members were fulfilling their fiduciary duties under the Plan and ERISA.

92.    Defendants failed to conduct an appropriate investigation into whether WellPoint stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan Participants with information regarding WellPoint's financial results so that Participants could make informed decisions regarding WellPoint stock in the Plan, or otherwise failed to protect the Plan and its Participants against inevitable loss in vested benefits.

93.    An adequate investigation by defendants would have revealed to a reasonable fiduciary that investment by the Plan in WellPoint stock offered by the Plan, under these circumstances, was imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect Participants against unnecessary loss of vested benefits, and would have made a different investment decision.

94.    Defendants had an obligation to protect the Plan and its Participants from the unreasonable and entirely predictable loss of vested benefits incurred as a result of the Plan's investment in Company stock.

95.    Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plan of Company stock; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the Participants of the Plan; or resigning as fiduciaries of the Plan to

the extent that as a result of their employment by the Company they could not loyally serve Participants in the Plan in connection with the Plan's acquisition and holding of Company stock.

96.    Despite the availability of these and other options, defendants failed to take any action to protect the Plan or its Participants from a loss of vested benefits as a result of Plan investment in WellPoint stock.

<strong>DEFENDANTS REGULARLY COMMUNICATED WITH<br>PARTICIPANTS IN THE PLAN CONCERNING WELLPOINT<br>STOCK OFFERED BY THE PLAN, YET FAILED TO DISCLOSE<br><u>THE IMPRUDENCE OF INVESTING IN COMPANY STOCK</u></strong>

97.    Upon information and belief, the Company regularly communicated with employees, including Participants in the Plan, about the performance, future financial and business prospects of the Company and its common stock.  During the Class Period, the Company fostered a positive attitude toward the Company's stock and/or allowed Participants in the Plan to follow their natural bias towards investing in the equities of their employer by not disclosing negative material information concerning investing in the Company's stock.  As such, Participants in the Plan could not appreciate the true risks presented by investing in the Company's stock and therefore could not make informed decisions regarding their investments in the Plan.

98.    As alleged above, these SEC filings and related statements and releases were inaccurate, incomplete and materially misleading, causing the Plan and its Participants to purchase, hold and maintain Plan investments in WellPoint stock.

99.    Defendants failed to provide Plan Participants with complete and accurate information regarding WellPoint stock, such that the Participants could appreciate the true risks presented by investing in WellPoint stock and could make informed decisions regarding investing in the Plan.

## TOLLING OF APPLICABLE LIMITATION PERIODS

100.    The claims asserted herein are timely.

101.    As an initial matter, defendants wrongfully concealed their conduct by systematically issuing false and misleading statements, by falsely reassuring Plan Participants about the Company and its business, and by failing to disclose the facts alleged in this Complaint.

102.    The Plan and its Participants had no reason to know of defendants' breach of fiduciary duties until at least March 10, 2008.

103.    The statute of limitations for the claims asserted in this Complaint were also tolled by the filing of class actions against WellPoint and some of the defendants in this action.

104.    As fiduciaries of the Plan and its Participants, defendants cannot rely on any limitations defense where they withheld from the Plan and its Participants the facts that give rise to the claims asserted herein.

## CLAIMS FOR RELIEF UNDER ERISA

105.    During the Class Period, defendants were, and acted as, fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

106.    ERISA § 502, 29 U.S.C. § 1132, provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

107.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of

24

the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

108.   ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

109.   These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." They entail, among other things:

(a)   The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan (including in this instance company stock) and to ensure that each investment is a suitable option for the plan; and

(b)   A duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

110.   ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co fiduciary," provides, in pertinent part, that:

> ". . . in addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or

omission is a breach; (2) if, by his failure to comply with section 1104(a)(1) [29 U.S.C. § 1104(a)(l)] of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless be makes reasonable efforts under the circumstances to remedy the breach."

111.    Plaintiff and the Plan therefore bring this action under the authority of ERISA § 502 for Plan-wide relief pursuant to ERISA § 409(a) to recover the loss of vested benefits sustained by the Plan arising out of the breaches of fiduciary duties by defendants.

## COUNT I

112.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

113.    During the Class Period, as alleged above, defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

114.    As alleged above, defendants were all responsible in different ways and to differing extents, for the selection, maintenance and monitoring of the Plan's investment options, including the option of investing in Company stock.

115.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in WellPoint stock in the Plan were prudent and are liable for the loss of vested benefits incurred as a result of such investments being imprudent.

116.    Moreover, a fiduciary's duty of loyalty and prudence require it to disregard plan

documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan to do so.

117.    Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, these defendants knew or should have known that WellPoint stock was not a suitable and appropriate investment for the Plan as described herein for either (i) WellPoint stock purchased through participant contributions to the Plan or (ii) WellPoint stock accumulated by the Plan through Company matching contributions.

118.    Nonetheless, during the Class Period, these fiduciaries continued to offer the WellPoint stock as an investment option for the Plan and to direct and approve Plan investment in WellPoint stock instead of in cash or other investments.

119.    Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, defendants failed to take adequate steps to prevent the Plan, and indirectly the Plan Participants and beneficiaries, from suffering a loss of vested benefits as a result of the Plan's investment in WellPoint stock.

120.    The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

121.    Defendants also breached their co-fiduciary obligations by, among other failures, knowingly participating in, making no effort to remedy, and/or knowingly undertaking to

27

conceal, their fellow defendants' failure to prudently and loyally manage Plan assets in the exercise of their discretion with respect to the offering Company stock as an investment option in the Plan despite knowing that such failures were breaches of their ERISA mandated fiduciary duties.

122.  As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their retirement investment.

123.  Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), defendants in this Count are liable to restore the lost profits and loss of vested benefits to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

124.  Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

125.  During the Class Period, as alleged above, defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 20 U.S.C. § 1002(21)(A).

126.  During the Class Period, as alleged above, the scope of the fiduciary responsibility of defendants included the responsibility to monitor other fiduciaries.

127.  The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries. In this case, that meant that defendants, as the monitoring fiduciaries, had the duty to:

   a.  Ensure that the monitored fiduciaries possessed the needed credentials and

experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of Plan Participants;

      b.   Ensure that the monitored fiduciaries had ready access to such outside, impartial advisors, counsel, and experts when needed;

      c.   Ensure that the monitored fiduciaries were provided with adequate financial resources to do their job;

      d.   Ensure that the monitored fiduciaries had adequate information and to do their job of overseeing the Plan investments;

      e.   Ensure that the monitored fiduciaries maintained adequate records of the information on which they based their decisions and analysis with respect to Plan investment options; and

      f.   Ensure that the monitored fiduciaries reported regularly to the Company. The Company must then review, understand, and approve the conduct of the hands-on fiduciaries.

128.   Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to investing plan assets, and must take prompt and effective action to protect the plan and participants when they are not. The duty to monitor encompasses a duty to periodically monitor the performance of the appointees so as to ensure compliance with their fiduciary duties under ERISA and the plan.

129.   The duty of prudence requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether investment fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the Plan's

performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to Plan Participants or for deciding whether to retain or remove them.

130.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

131.    Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries appreciated the huge risk inherent in the significant investment by rank and file employees in a undiversified employer stock.

132.    Defendants knew or should have known that the fiduciaries they were responsible for monitoring were imprudently allowing the Plan to continue offering the WellPoint stock as a Plan investment, and continuing to invest in WellPoint stock and units when it no longer was prudent to do so, yet failed to take action to protect the Participants from the consequences of these fiduciaries' failures.

133.    In addition, defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition and practices of the Company that they knew or should have known that these

defendants needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, defendants breached their monitoring duties under the Plan and ERISA.

134.    Defendants are liable as a co-fiduciaries because: (a) they knowingly participated in the fiduciary breaches by their fellow defendant fiduciaries in the activities implicated in this Count; (b) they enabled the breaches by these defendants; and (c) they had knowledge of these breaches yet failed to make any effort to remedy them.

135.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their retirement investment.

136.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), defendants in this Count are liable to restore the lost profits and loss of vested benefits to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

137.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

138.    During the Class Period, as alleged above, defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

139.    During the Class Period, the scope of the fiduciary responsibility of defendants included Plan communications and material disclosures.

140.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the Plan or Plan assets, and to disclose information that Participants need in order to exercise their rights and interests under the Plan. This duty to

inform Participants includes an obligation to provide Participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding Plan investment options, such that Participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan.   This duty applies to all Plan investment options, including investing in WellPoint stock.

141.   Because investment in the Plan was not diversified (*i.e.*, defendants chose to invest the Plan's assets, and/or allow those assets to be invested, so heavily in WellPoint stock), such investment carried with it an inherently high degree of risk.   This inherent risk made defendants' duty to provide complete and accurate information particularly important with respect to WellPoint stock.

142.   Defendants breached their duty to inform Participants by failing to provide complete and accurate information regarding WellPoint and its stock, the Company's business and prospects and the consequent artificial inflation of the value of WellPoint stock and, generally, by conveying inaccurate information regarding the soundness of WellPoint stock and the prudence of investing retirement contributions in WellPoint equity.   These failures were particularly devastating to the Plan and the Participants and had an enormous impact on the value of Participants' retirement assets.

143.   Defendants in this Count are also liable as co-fiduciaries because (a) they knowingly participated in or knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding WellPoint stock, despite knowing of their breaches; (b) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; or (c) they had knowledge of the other fiduciaries' failures to satisfy their duty

to provide only complete and accurate information to Participants, yet did not make any effort to remedy the breaches.

144. Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment. Here, the above described statements, acts and omissions of defendants constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in WellPoint stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of their invested Plan assets in WellPoint stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of defendants as described herein.

145. Defendants in this Count were unjustly enriched by the fiduciary breaches described in this Count.

146. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their retirement investment.

147. Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), each defendant is liable to restore the lost profits and the loss of vested benefits to the Plan caused by that defendant's breaches of fiduciary duties alleged in this Count.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

148. Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's

assets should not have been so heavily invested in Company stock.

149.    As a consequence of defendants' breaches, the Plan suffered a significant loss in vested benefits.

150.    Each defendant is jointly liable for the acts of the other defendants as a co-fiduciary.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for:

A.    A declaration that defendants, and each of them, have breached their ERISA fiduciary duties to Plaintiff and the Participants;

B.    An Order compelling defendants to make good to the Plan all lost profits and loss of vested benefits to the Plan resulting from defendants' breaches of their fiduciary duties, including loss of vested benefits to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if defendants had fulfilled their fiduciary obligations;

C.    Imposition of a Constructive Trust on any amounts by which any defendant was unjustly enriched at the expense of the Plan or any Participant as the result of breaches of fiduciary duty;

D.    An Order enjoining defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

E.    An Order that defendants allocate the Plan's recoveries to the accounts of all Participants who had any portion of their account balances invested in Company stock

maintained by the Plan in proportion to the accounts' loss of vested benefits attributable to the decline in the price/value of Company stock;

F.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G.    An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.    An Order for equitable restitution and other appropriate equitable monetary relief against defendants.

DATED: June 13, 2008                    **COHEN & MALAD, LLP**

By: _____
Scott D. Gilchrist

Irwin B. Levin
Richard E. Shevitz
Scott D. Gilchrist
One Indiana Square
Suite 1400
Indianapolis, Indiana 46204
Telephone: 317-636-6481
Facsimile: 317-636-2593
ilevin@cohenandmalad.com
rshevitz@cohenandmalad.com
sgilchrist@cohenandmalad.com

**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser
Brett D. Stecker
121 N. Wayne Avenue
Suite 100
Wayne, PA 19087
Telephone: 610-225-2677
Facsimile: 610-225-2678

***Attorneys for Plaintiff***